In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00220-CR


______________________________




CURT ANTHONY PORTER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 188th Judicial District Court


Gregg County, Texas


Trial Court No. 33782-A




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION


 Had he not been stopped by a train, Derrick Kennedy might still be alive today. But he was
stopped, and the ensuing chain of events resulted in Kennedy's death and Curt Anthony Porter's life
imprisonment for that death.

 The record shows Kennedy had stopped near the Tree House Apartments in Longview,
Texas, for a passing train on the evening of September 26, 2005. As Kennedy sat in his car waiting
for the train to pass, Porter approached. Porter had recently purchased a vehicle from Kennedy, but
the car turned out to be a lemon. Porter confronted Kennedy, the two exchanged words, and shortly
thereafter Porter punched the still-seated Kennedy. This prompted Kennedy to exit his vehicle, and
a fight of sorts ensued. Porter would later admit that Kennedy, who was but 5' 6" tall and slightly
built, got the better of the much heavier and 6' 0" tall Porter--ostensibly because Kennedy would
not engage in a "fair" fight, according to Porter. Nevertheless, after the fisticuffs between the two
ended, Porter drew a gun and shot the unarmed Kennedy twice, killing him. 

 A jury found Porter guilty of murder and assessed his punishment at life imprisonment and
a fine of $10,000.00. See Tex. Penal Code Ann. § 19.02 (Vernon 2003) (criminalizing murder and
classifying offense as first-degree felony), § 12.42(c)(1) (Vernon Supp. 2007) (outlining punishment
range for first-degree felonies). Porter now appeals, raising a multitude of issues. After reviewing
the record and hearing oral argument, we overrule Porter's points of error, reform the trial court's
judgment to reflect that Porter's conviction came pursuant to a violation of the Texas Penal Code
(rather than the Texas Property Code), and affirm the trial court's judgment as reformed. We do so
based on a number of logical steps:

 (1) Legally and factually sufficient evidence supports Porter's conviction.

 (2) The State did not necessarily comment on Porter's failure to testify.

 (3) Ineffective assistance of counsel has not been shown.

 (A) Failing to request a charge on sudden passion was not ineffective.

 (B) Counsel's admission, during punishment, that Porter shot Kennedy was
not ineffective.


 (C) Not calling more character witnesses was not ineffective.

 (D) Not objecting to the State's arguments was not ineffective.

 (E) Failure to argue a two-shooter theory during guilt/innocence was not
ineffective.


 (4) Denying Porter's motion for new trial was not error.

 (A) Ineffective assistance of counsel was not established.

 (B) The trial court did not abuse its discretion on the juror misconduct issue.

 (5) Porter's sentence is not cruel and unusual punishment.

 (6) The trial court's judgment is not void, but should be reformed.

 (7) The trial court did not err in failing to issue, sua sponte, a sudden-passion
instruction.

(1) Legally and Factually Sufficient Evidence Supports Porter's Conviction 

 In three points of error, Porter contends the evidence produced at trial is legally and factually
insufficient to support his conviction. We disagree.

 Under a challenge to the legal sufficiency of the evidence, we must consider the evidence
adduced at trial in the light most favorable to the jury's verdict and determine, based on that evidence
and reasonable inferences therefrom, whether a jury could have rationally found the essential
elements of the charged crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
318-19 (1979); Powell v. State, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); McDowell v. State,
235 S.W.3d 294, 296 (Tex. App.--Texarkana 2007, no pet.). In conducting this review, we must
give deference to "the responsibility of the trier of fact fairly to resolve conflicts in testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson,
443 U.S. at 318-19. We should also look at "events occurring before, during and after the
commission of the offense, and may rely on actions of the defendant which show an understanding
and common design to do the prohibited act." Cordova v. State, 698 S.W.2d 107, 111 (Tex. Crim.
App. 1985). Circumstantial evidence is as probative as direct evidence in establishing the guilt of
an actor, and circumstantial evidence alone may be sufficient to establish guilt. Guevara v. State,
152 S.W.3d 45, 49 (Tex. Crim. App. 2004). On appeal, the same standard of review is used for both
circumstantial and direct evidence cases. 

 When reviewing the evidence for factual sufficiency, we review all the evidence admitted
at trial in a neutral light. The evidence supporting a jury's verdict may be factually insufficient if the
evidence supporting the jury's verdict is so weak that the jury's judgment appears clearly wrong or
manifestly unjust or if the evidence supporting the judgment of conviction is outweighed by the great
weight and preponderance of the evidence. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App.
2007); McDowell, 235 S.W.3d at 296. This factual sufficiency standard requires that we reach "a
high level of skepticism" before we may reverse a jury's verdict based on factual insufficiency. 
Roberts, 220 S.W.3d at 524.

 A person commits the crime of murder in Texas if the actor (1) intentionally or knowingly,
(2) causes the death, (3) of another. Tex. Penal Code Ann. § 19.02(b)(1). The indictment in this
case alleged Porter caused Kennedy's death by shooting him with a firearm. In addition to proving
each element of the charged offense, the State must generally prove that at least one element of the
crime occurred in the county under whose auspices the case is being prosecuted--in this case, Gregg
County. See Tex. Code Crim. Proc. Ann. art. 13.17 (Vernon 2005). To support its burden of
proof, the State offered the testimony of several witnesses and produced several exhibits for the
jury's consideration.

 (a) The State's Evidence

 Ladarius Hodge and Charles Crump both testified that, on the evening of September 26,
2005, they saw Porter and Kennedy fighting near the Tree House Apartments in the south part of
Longview. Both Crump and Hodge told the jury that, once the physical struggle ended, they saw
Porter draw a gun and shoot at Kennedy several times. According to both of these witnesses, Porter
then fled the scene and had caught a ride with Hodge to the home of Porter's girlfriend. (1) Hodge told
the jury that, when Porter got inside the vehicle, Porter was holding a small, dark-colored
revolver--the same gun Hodge testified he had seen Porter use earlier to shoot Kennedy. 

 Hodge had also given police a written statement, which was admitted at trial. This written
statement was consistent with Hodge's trial testimony, but it was inconsistent with Hodge's initial
denial to police of having witnessed any crime whatsoever on the night of the shooting. And like
Hodge, Crump initially denied to police that he had been at the crime scene when Kennedy was shot;
Crump similarly was later more forthcoming to police. 

 Elicia Sanders, a former schoolmate of Porter, was at the Tree House Apartments at the time
of Kennedy's murder. Sanders told the jury that, while she had not heard any gunfire on the evening
of Kennedy's murder, she did see Crump and Porter running from the area where she later learned
a shooting had occurred. She described Porter as being dressed in shorts and wearing a white
sleeveless T-shirt, with a second shirt draped around his neck. 

 Britney McClain told the jury that she and her roommate heard shots being fired in the area
of the apartment complex on the evening in question. McClain said she shortly thereafter saw a
"bigger black male" wearing a sleeveless shirt running across the complex. Another witness, Ginger
Orange, who was also a resident of the apartments, similarly testified that she had seen an "African
American, heavy set" man--who "looked kind of young," wore two shirts (the bottom layer being
a white T-shirt and the top layer being a darker colored shirt), and wore his hair in braids--running
away from the scene of the shooting. During her testimony, McClain told the jury that she saw the
running man drop a small, perhaps silver colored, handgun. The runner then turned around, picked
up the gun, and continued fleeing the crime scene. Both Orange and McClain said the shooter was
ultimately driven away in a car. The State asked neither McClain nor Orange to make an in-court
identification of Porter as being one of the persons they had seen fleeing the apartment complex on
the night of Kennedy's murder.

 Dr. Lynn Salzberger, the medical examiner who autopsied Kennedy, testified the victim died
as a result of being shot twice at close range by a firearm. 

 Detective David Cheatham of the Longview Police Department testified that Kennedy was
shot and killed at Longview's Tree House Apartments, in Gregg County, Texas. Around 9:55 p.m.
on September 26, Cheatham was dispatched to these apartments regarding a shooting. Cheatham's
investigation ultimately led him to consider Porter a suspect in Kennedy's murder. Cheatham located
and arrested Porter September 27 for an outstanding traffic warrant. Once in custody, and after
waiving his Miranda (2) rights, Porter responded to police questioning about Kennedy's murder during
two separate interviews, recordings of which were admitted into evidence and played for the jury.

 During these interviews, Porter told police that he and Kennedy saw each other at the Tree
House Apartments sometime after 8:00 p.m. the evening in question. Porter and Kennedy got into
a dispute over a car that Kennedy had sold Porter and that had begun malfunctioning shortly after
the sale. Porter admitted he and Kennedy then got into a fistfight over the car. But Porter told police
that, once the fight ended, Porter left Kennedy and was taken to his girlfriend's home by Hodge. 
Porter repeatedly denied killing Kennedy or owning or possessing a gun at any time. Porter claimed
he spent that night with his girlfriend and was with her at the time of the murder.

 Porter was able to solicit testimony from Detective Cheatham that Cheatham has little faith
in Hodge and Crump for telling the truth.

 (b) Porter's Evidence

 Sundra Richardson, Porter's girlfriend, testified that Porter came to her home the evening of
September 26, though she was unsure of the time he arrived. Richardson told the jury that she and
Porter talked briefly about Porter having been involved in a confrontation or fight earlier that
evening. She then said Porter had spent the night at her home that night. 

 Richardson told the jury she was shocked when she learned police suspected Porter as
Kennedy's killer. She said she does not believe Porter would kill another human being. She also
testified she had never seen Porter in possession of a firearm. 

 During her direct examination by Porter's trial counsel, Richardson admitted that she is
currently under felony community supervision for a drug conviction. 

 (c) Analyzing Evidentiary Sufficiency

 The testimony from Crump and Hodge is sufficient to establish the necessary elements of
Porter's murder conviction. Additionally, these testimonies were corroborated by other, disinterested
witnesses. For example, while the State asked neither McClain nor Orange to identify Porter in court
as being the same man they had previously seen fleeing the murder scene, the jurors in this case
could easily have concluded that those witnesses' descriptions matched Porter's general physical
appearance at the time of the murder. This is because Porter's custodial interview (which was taken
the day following the murder) shows Porter wearing a sleeveless undershirt, he appears to be
substantially overweight, and he is wearing his hair in braids--all physical characteristics which
Orange and McClain had used to describe Kennedy's killer. Robinson also testified she had seen
Porter in possession of a small gun a few days before Kennedy's murder. We thus conclude the
direct and circumstantial evidence, as well as the reasonable inferences that may be made therefrom,
provide legally sufficient evidence to support the jury's verdict.

 With respect to factual sufficiency, there are several problems with the State's case. First,
several witnesses (most notably Detective Cheatham) characterized Hodge and Crump as liars. Such
characterizations of the State's only eyewitnesses, if believed by the jury, would undoubtedly tend
to discount the weight the jury might accord their testimonies. Second, the police did not recover
any tangible evidence (like a murder weapon, gunshot residue, or something with Porter's
fingerprints) to create a physical evidence connection between Porter to the murder that otherwise
might corroborate the arguably sketchy witness testimony. Third, Richardson testified that Porter
spent the night at her home (although her testimony is unclear as to what time Porter arrived that
evening). On balance, however, we cannot conclude that the evidence supporting the jury's verdict
is so weak that the verdict appears manifestly unjust. Nor can we conclude the evidence supporting
the jury's verdict is outweighed--even marginally--by contrary evidence. Thus, we conclude the
evidence is factually sufficient to support Porter's conviction.

 Porter's points of error urging evidentiary insufficiency are overruled.

(2) The State Did Not Necessarily Comment on Porter's Failure To Testify

 Porter also contends the State twice impermissibly commented on Porter's failure to testify
in his own defense. "It is settled law that neither the trial judge nor the prosecution may comment
on the defendant's failure to testify, and that any such comment violates the Fifth Amendment
privilege against self-incrimination." Cruz v. State, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007). To violate the right against self-incrimination, the offending language must be
viewed from the jury's standpoint and the implication that the comment referred to
the defendant's failure to testify must be clear. It is not sufficient that that language
might be construed as an implied or indirect allusion. The test is whether the
language used was manifestly intended or was of such character that the jury would
necessarily and naturally take it as a comment on the defendant's failure to testify. 
In applying this standard, the context in which the comment was made must be
analyzed to determine whether the language used was of such character.


Bustamante v. State, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001).

 The first challenged comment by the State occurred during the opening portion of the State's
summation:

We've proven to you that on the 26th day of September, 2005[,] Derrick Kennedy
was shot by a firearm. We don't have the firearm. There's only one person that
knows where the firearm is. We don't have it. We don't have to have it. We're not
talking about casings being hit on the back by a rock. You've got to have a firearm
to discharge it. We've got the casings that went into that young man's body and
ended his life. They were fired intentionally. They were fired knowingly. You don't
accidentally shoot a gun two times at somebody.


(Emphasis added.) The other asserted comment by the State came just before the case was submitted
to the jury:

Now, you heard enough testimony in cross-examination on scientific evidence to
kind of know where that is. Bottom line is, the experts told you what would or
wouldn't show [sic] and what they would need. We can't find the gun and I agree
there is one person that knows where that gun is. You know, what's the facts
surrounding this?


(Emphasis added.) Porter did not object to either argument at trial. 

 In Cruz, the State had argued, "They want to say that it's self-defense. Well, in order to have
self-defense, what has to happen is someone says, 'Yeah, I committed this crime. I committed this
murder. I did this and I intended to do this because I was in fear of my life.'" 225 S.W.3d at 547. 
This State's highest criminal court analyzed the context of that argument and held the State did not
impermissibly comment on the defendant's failure to testify because the argument at issue concerned
the verity of the accused's written statement to police and did not concern anything to which he failed
to testify at trial. Id. at 548-50.

 In the case at bar, we conclude the State's challenged arguments do not comment on Porter's
failure to testify. The State was summarizing all the evidence during the relevant portions of the jury
argument. By the time of closing argument, the jury had already seen videotapes of Porter's custodial
interviews, during which Porter repeatedly denied having ever owned or possessed a gun. Being
mindful of such interview evidence, we conclude that, from the jury's perspective, the State's
challenged arguments amount to reasonable comments on Porter's denials during those custodial
interviews about having ever possessed or owned a gun--claims that, based on the entire tenor of
the closing argument, the State clearly believed to be untrue. Cf. Coleman v. State, 881 S.W.2d 344,
358 (Tex. Crim. App. 1994) (four permissible areas of jury argument include summation of
evidence, reasonable deductions from evidence, answer to argument of opposing counsel, and plea
for law enforcement). The challenged arguments are not comments on Porter's failure to testify at
trial.

(3) Ineffective Assistance of Counsel Has Not Been Shown

 Porter also contends his trial counsel provided ineffective assistance by (a) failing to request
a charge on sudden passion, (b) arguing Porter drew a pistol and shot Kennedy, (c) failing to elicit
available character evidence for the jury's consideration during the punishment phase, (d) failing to
object to the State's closing argument at guilt/innocence, and (e) failing to argue a two-shooter theory
to create reasonable doubt as to Porter's guilt. 

 (a) Failing To Request a Charge on Sudden Passion Was Not Ineffective

 Counsel did not request the trial court's punishment charge include a sudden-passion
instruction. At the hearing on Porter's motion for new trial, counsel admitted that the substance of
his punishment argument concerned a plea for mitigation in that Porter had acted under "sudden
passion." Porter's appellate counsel then asked trial counsel, "[I]f that is indeed what was behind
what you were getting at to the jury would it have not been better practice at the charge conference
on punishment to bring that up and request the court to include that as part of the charge to the jury?" 
Trial counsel responded, "Yes. I agree." Porter's appellate counsel then asked, "Can you give the
Court any reason here today as we sit here in terms of trial strategy or otherwise as to why you would
not have done that?" Trial counsel admitted, "No. I can't give the court a reason why I didn't do
that." This admission by his trial counsel forms Porter's first basis for claiming ineffective assistance
now on appeal.

 In this forum, the State suggests that a sudden-passion instruction would have been
inconsistent with Porter's general theory of the case. The State contends that "[a]n abrupt change in
theory in the midst of trial would not be credible." That may be a good general proposition, but such
an argument ignores the fact that trial counsel did, in fact, change his trial strategy in the middle of
the case--as evidenced by comparing the tenor of his closing argument on guilt/innocence with his
argument at punishment.

 The State also argues that the evidence did not support giving a sudden-passion instruction. 
To be entitled to a sudden-passion instruction, there must be evidence that the defendant caused the
victim's death while the defendant acted "under the immediate influence of sudden passion arising
from an adequate cause." Tex. Penal Code Ann. § 19.02(d) (emphasis added). The Texas Penal
Code further defines "adequate cause" as something "that would commonly produce a degree of
anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind
incapable of cool reflection." Tex. Penal Code Ann. § 19.02(a)(1). 

 In Willis v. State, 936 S.W.2d 302, 305 (Tex. App.--Tyler 1996, pet. ref'd), the defendant
was arguing with his stepson when the latter walked out of their home and broke out the windows
of the defendant's car. Willis then went to another part of the home and retrieved a gun, which the
defendant used to repeatedly shoot his stepson in the back. Id. at 305-06. In his videotaped
confession, Willis testified the shooting was in self-defense. Id. at 306. In holding that the issue of
sudden passion arising from adequate cause was not raised, the Tyler court noted that, in the
videotaped confession, the defendant never stated that the incident caused him to be afraid or angry
or that he acted under any emotional distress, and there was no other testimony to that effect. Id. at
309. Declaring that "we are not free to recognize the requisite heightened emotional state by
implication" and "[i]t is not enough to merely depict the defendant's physical behavior and the
physical context in which it arose," the Tyler court held that the issue simply was not raised. Id.

 In Saldivar v. State, 980 S.W.2d 475, 505 (Tex. App.--Houston [14th Dist.] 1998, pet. ref'd),
the defendant contended she was entitled to a charge on sudden passion arising from an adequate
cause because she had become enraged after the victim divulged that the victim's father had accused
Saldivar of embezzlement and lesbianism, which led to a continued argument in a motel room and
immediately escalated into a killing. Id. In holding that sudden passion arising from an adequate
cause was not raised, the Houston court admitted the victim initially provoked the defendant's anger. 
Id. at 506. However, the appellate court concluded Saldivar's testimony did not amount to evidence
of the extreme emotional and psychological state for which the definitions of sudden passion and
adequate cause call. Id. The court noted that, to justify a charge on sudden passion arising from an
adequate cause, the defendant's reactions to the triggering provocations must be an objectively
common response that an ordinary, reasonable person would make. Id. An aberrational response
to a stimulus that results in death will not meet the statutory definitions under chapter nineteen of
the Texas Penal Code. Id. In reaching its holding, the court stated, "Shooting an employer and
friend in the back as she walks away from an argument is not an objectively common response in
an ordinary reasonable person." Id.

 In this case, there is no evidence that the previous fight between Kennedy and Porter would
have produced a degree of anger, rage, or resentment in a person of ordinary temper to the necessary
degree that would cause such an ordinary person to lose his or her sensibilities and instinctively
respond by drawing a pistol and shooting Kennedy--especially when all the eyewitnesses said Porter
shot Kennedy after the fight had ended and the two had physically separated. In fact, during Porter's
jailhouse interviews, he repeatedly states he was unafraid of Kennedy (in light of the size differential
between the two) and was an otherwise peaceable man. Finally, Porter's own statement to police
shows he was the aggressor in the initial confrontation, a factor that some courts have said deprives
a murderer of the right to claim self-defense. See, e.g., Westbrook v. State, 846 S.W.2d 155, 159
(Tex. App.--Fort Worth 1993, no pet.) (defendant not entitled to sudden-passion instruction when
evidence showed he was initial aggressor).

 Because no evidence supports any claim that the shooting was produced by an adequate
cause, Porter would not have been entitled to an instruction on sudden passion. Cf. Adanandus v.
State, 866 S.W.2d 210, 230-31 (Tex. Crim. App. 1993) (evidence showed defendant shot victim
after scuffle between two had ended; victim in prone position and defendant in upright position when
fatal shot fired). Ineffective assistance based on this claim is unsupported by the record.

 (b) Counsel's Admission, During Punishment, that Porter Shot Kennedy Was Not
Ineffective


 Defense counsel's theory of the case during guilt/innocence was that Porter did not shoot
Kennedy. Counsel's theory of the case changed, however, once the trial went into the punishment
phase. In his punishment summation, Porter's trial counsel assumed the shooting and sought to
mitigate blame:

At some point, [Porter] snaps, loses his temper completely. Now, that's what
happens when you mix young men and firearms and violent physical confrontations. 
People lose their temper, they snap, they do things that on sober reflection they'd
never do. So that's what we have. We have one moment of extreme anger. And I'm
not putting all the blame on Derrick Kennedy. I'm not putting all the blame on Curt
Porter either, but what he did was wrong and deserves the punishment.


On appeal, Porter now argues that counsel's argument during punishment amounted to ineffective
assistance because such argument amounted to an admission of the crime.


 It is not unreasonable for a trial attorney to accept the jury's verdict on guilt/innocence and
try to mitigate punishment by arguing that the facts show the defendant acted not out of cold-bloodedness, but out of sudden whim. Such an argument might persuade a jury to assess punishment
at the lower end of the applicable sentencing range. The fact that such an argument did not work
here does not necessarily mean that the argument was devoid of a reasonable trial strategy; the result
(of Porter receiving a maximum punishment) merely means counsel's trial strategy did not work. 
We cannot say that no reasonable attorney would have employed such a strategy. As such, we
cannot conclude the record on this issue will support a finding of ineffective assistance.

 (c) Not Calling More Character Witnesses Was Not Ineffective

 Porter also claims he received ineffective assistance at trial because his trial counsel failed
to call more than one character witness on his behalf during punishment. The appellate record
shows that, during punishment, Porter's trial counsel called but one witness, Reverend Adrian Porter. 
At the hearing on Porter's motion for new trial, Porter called several more witnesses, each of whom
testified that he or she would have testified as character witnesses on Porter's behalf at the
punishment trial, if only they had been called. Porter's trial counsel explained that he called none
of these witnesses because he had instructed them each to be at Porter's trial by 8:30 on the morning
of the punishment trial and that none, except for Reverend Porter, arrived until after 9:00, which was
well after the punishment trial had begun. Because of their untimely arrival, Porter's trial counsel
did not have the opportunity to discuss their potential testimonies before calling them to the witness
stand. Additionally, the at-issue witnesses came into the courtroom during Reverend Porter's
testimony, "the rule" had been invoked by both sides in this case, and these witnesses had listened
to part of Reverend Porter's testimony. Porter's trial counsel testified to his belief that, by hearing
Reverend Porter's testimony, each witness had violated "the rule" and thus would have been excluded
by the State had Porter's trial counsel attempted to call any of them to testify. The only character
witness who had not violated "the rule" and who was in court at the proper time, Reverend Porter,
did testify on behalf of the accused. 

 The explanation by Porter's trial counsel on this issue portrays a reasoned trial strategy. 
While a different lawyer might have sought a waiver of "the rule" for these witnesses, there is no
evidence in the record that either the trial court or the elected district attorney (who was the lead
prosecutor in this case) would have allowed the witnesses to testify. We conclude the record before
us does not support Porter's claim of ineffective assistance on this issue.

 (d) Not Objecting to the State's Arguments Was Not Ineffective

 Porter next contends he received ineffective assistance from his trial counsel because the
latter did not object to the State's closing argument during guilt/innocence. The State's challenged
statements in this sub-issue are the same statements made by the State that were the subject of
Porter's point of error asserting that the State commented on Porter's failure to testify.

 We have already addressed the appropriateness of the State's challenged arguments during
guilt/innocence, and found that they presented no reversible error. Accordingly, we similarly
conclude Porter's trial counsel did not render ineffective assistance by failing to object to the State's
challenged arguments because such arguments (when viewed in context and from the perspective
of the jury) did not necessarily comment on Porter's failure to testify at trial, but instead permissibly
commented on evidence contained in Porter's custodial interviews.

 (e) Failure to Argue a Two-Shooter Theory During Guilt/Innocence Was Not Ineffective

 Finally, Porter contends his trial counsel provided ineffective assistance by failing "to argue
to the jury that the two bullets and two wounds raised a reasonable doubt about Appellant's guilt,
because that evidence points to the presence of two weapons and two assailants, not to Appellant." 

 The substance of an attorney's closing argument is inherently a product of trial strategy. See
generally Ramirez v. State, 229 S.W.3d 725, 730-31 (Tex. App.--San Antonio 2007, no pet.). 
Porter's trial counsel argued that the evidence was insufficient because the State's witnesses were
incredible, an argument that is both common among the defense bar of this state and entirely
reasonable based on the notable testimony adduced at trial on the lack of credibility of both Hodge
and Crump, the State's primary witnesses. Now, with the advantage of hindsight, appellate counsel
would now present a different theory of the case in an effort to create reasonable doubt among the
jurors' minds. Simply because a jury did not buy into a defense strategy does not mean the strategy
was flawed or substandard. Finally, we note that, even if we accepted Porter's claim that his trial
counsel's argument fell below professional norms, the record before us provides no evidence that
such argument necessarily prejudiced Porter. Cf. Ex parte McFarland, 163 S.W.3d 743, 758 n.50
(Tex. Crim. App. 2005) (capital murder habeas applicant did not demonstrate record established that,
but for counsel's allegedly inadequate closing argument, jury would have answered special issues
differently).

 We overrule this point of error.

(4) Denying Porter's Motion for New Trial Was Not Error

 Porter also contends the trial court erred by overruling his motion for new trial. Porter's
motion for new trial raised two issues: (A) ineffective assistance of trial counsel and (B) juror
misconduct. The trial court heard testimony on both issues at an evidentiary hearing on Porter's
motion. At the conclusion of the hearing, the trial court took the matter under advisement and later
summarily denied the motion without explanation. Porter now asserts the trial court should have
granted a new trial based on the proof of either ineffective assistance or juror misconduct.

 We review a trial court's ruling on a motion for new trial for abuse of discretion. Salazar v.
State, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). It should also be noted, however, that "both the
performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and
fact." Strickland v. Washington, 466 U.S. 668, 698 (1984); see also Williams v. Taylor, 529 U.S.
362, 419 (2000). Therefore, although we generally use an abuse-of-discretion standard to review
decisions to grant or deny motions for new trial, we are not bound by the trial court's conclusion
regarding effectiveness of counsel. See Strickland, 466 U.S. at 698; Johnson v. State, 169 S.W.3d
223, 239 (Tex. Crim. App. 2005). If the trial court is not in an appreciably better position than the
appellate court to determine an issue of ineffective assistance, the reviewing court may independently
determine the issue while necessarily affording deference to the trial court's factual findings. Miller
v. Fenton, 474 U.S. 104, 117 (1985); Villarreal v. State, 935 S.W.2d 134, 139 (Tex. Crim. App.
1996) (McCormick, P.J., concurring). 

 (a) Ineffective Assistance of Counsel Was Not Established

 We have addressed Porter's claims of ineffective assistance on their merits. On the same
basis as we stated above, we conclude the trial court was not bound to find ineffective assistance. 
We, therefore, conclude the trial court did not err by denying Porter's motion for new trial to the
extent that it was based on a claim of ineffective assistance of counsel.

 (b) The Trial Court Did Not Abuse Its Discretion on the Juror Misconduct Issue

 To his motion for new trial Porter attached affidavits from several trial spectators. The first,
Raven Covy, is Porter's fiancé. Covy testified that she observed one of Porter's jurors sleeping
during the trial. Another spectator, Vivian Porter, testified that he saw some of the jurors sleeping
during his grandson's trial. Porter's mother, Tumar Porter, similarly testified to having seen sleeping
jurors. 

 The trial court was in the best position to evaluate the credibility of the witnesses on this
issue and could also rely on its independent memory and observations of the jurors during trial. As
the trial court's decision to deny Porter's motion for new trial could have been based on either its
determination of witness credibility or the court's independent recollection of events (or both), and
because the trial court was in an appreciably better position both to determine witness credibility and
to observe the now at-issue jurors during trial, we must defer to such a determination and overrule
Porter's claim of error.

(5) Porter's Sentence Is Not Cruel and Unusual Punishment

 Porter also contends the jury's assessment of his punishment at life imprisonment constitutes
cruel and unusual punishment. Several considerations require us to overrule this contention.

 First, Porter's punishment fell within the range authorized by our law. He was convicted of
murdering Kennedy by shooting him with a firearm. Murder is a first-degree felony. See Tex.
Penal Code Ann. § 19.02(c). The punishment range for a first-degree felony is imprisonment for
life or for any term not more than ninety-nine years or less than five years. See Tex. Penal Code
Ann. § 12.32(a) (Vernon 2003). "Texas courts have traditionally held that as long as the punishment
is within the range prescribed by the Texas Legislature, the punishment is not excessive, cruel, or
unusual." Sierra v. State, 157 S.W.3d 52, 65 (Tex. App.--Fort Worth 2004), aff'd, 218 S.W.3d 85
(Tex. Crim. App. 2007); see also Jordan v. State, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973);
Alberto v. State, 100 S.W.3d 528, 529 (Tex. App.--Texarkana 2003, no pet.). Because Porter's life
sentence fell within the statutory punishment range, his claim that his sentence constitutes cruel and
unusual punishment--and thereby violates the Eighth Amendment to the United States
Constitution--lacks support in our jurisprudence. See U.S. Const. amend. VIII.

 Second, to determine whether Porter's life sentence is cruel, unusual, or similarly
disproportionate, evidence in the appellate record would be needed regarding what sentences other
Texas defendants have received for murder. See Harmelin v. Michigan, 501 U.S. 957 (1991); Solem
v. Helm, 463 U.S. 277, 292 (1983). There is no such evidence in this appellate record. Nor is there
is any evidence in the appellate record of what sentences other defendants in other states have
received for murder. See Solem, 463 U.S. at 292. Thus, even if we were to ignore the appellate
jurisprudence of this State and conclude that a life sentence is necessarily too severe a punishment
to assess against someone convicted of murder, the appellate record contains insufficient evidence
for use in analyzing the remaining Solem factors to determine whether Porter's appellate record will
support a challenge to his sentence under the Eighth Amendment. Cf. Guin v. State, 209 S.W.3d
682, 687-88 (Tex. App.--Texarkana 2006, no pet.); Williamson v. State, 175 S.W.3d 522, 525 (Tex.
App.--Texarkana 2005, no pet.); Alberto, 100 S.W.3d at 530.

 Finally, the United States Supreme Court has repeatedly stated that the determination of
appropriate punishment ranges for felony offenses is a matter of legislative prerogative. See, e.g.,
Harmelin, 501 U.S. at 962 (Scalia, J., writing for the majority). To the extent Porter asks this Court
to effectively rewrite this State's punishment laws, we decline the invitation. Because Porter's
sentence fell within the applicable punishment range, his punishment presumptively passes muster
under the Eighth Amendment.

(6) The Trial Court's Judgment Is Not Void, But Should be Reformed

 Porter also contends "[t]he trial court reversibly erred when, in its judgment, it imposed
sentence under section 19.02(b)(1), Texas Property Code, thereby having no jurisdiction to
pronounce sentence, and, therefore, the judgment is void and of no effect." (Emphasis added.) 
While the written judgment cites to a nonexistent Section 19.02(b)(1) of the Texas Property Code,
the remainder of the judgment makes clear that Porter was convicted of murder. See Tex. Penal
Code Ann. § 19.02(b)(1) (one way to commit murder). The State contends the judgment's reference
to the Texas Property Code is merely a clerical error that can be reformed either on appeal or through
a nunc pro tunc judgment entered by the trial court. (3) 

 The State is correct. The trial court's judgment referencing Article 19.02 of the Texas
Property Code, rather than Section 19.02 of the Texas Penal Code, amounts to a mere clerical error
and is not the product of judicial reasoning. See Dudley, 223 S.W.3d at 722; and contrast Harris
v. State, 153 S.W.3d 394, 396-97 (Tex. Crim. App. 2005) (trial court's decision to increase sentence
by fifteen years after first sentence vacated on appeal, not permissible correction of unauthorized
sentence nor permitted revision of judgment via nunc pro tunc). We have the authority to reform
the trial court's judgment to reflect that the jury found Porter guilty of murder in violation of Section
19.02 of the Texas Penal Code. See, e.g., French v. State, 830 S.W.2d 607 (Tex. Crim. App. 1992);
Gonzalez v. State, 527 S.W.2d 540, 541 n.1 (Tex. Crim. App. 1975). Accordingly, the trial court's
judgment is reformed to reflect Porter was convicted for violating the Texas Penal Code rather than
the Texas Property Code. We otherwise overrule this point of error.

(7) The Trial Court Did Not Err in Failing to Issue, Sua Sponte, a Sudden-Passion Instruction

 Finally, Porter contends the trial court erred by failing to, sua sponte, instruct the jury on
sudden passion. We disagree.

 "If a defendant is convicted of murder, he or she may argue at punishment that he or she
caused the death of the victim while under the immediate influence of sudden passion arising from
adequate cause." Bradshaw v. State, No. 06-06-00178-CR, 2007 WL 4224853, at *1 (Tex.
App.--Texarkana Dec. 3, 2007, no pet.). "If a defendant establishes by a preponderance of the
evidence that he or she did so, the offense level is reduced from a first-degree to a second-degree
felony." Id. (citing Tex. Penal Code Ann. § 19.02; Trevino v. State, 100 S.W.3d 232, 237 (Tex.
Crim. App. 2003)). "'Sudden passion' means passion directly caused by and arising out of
provocation by the individual killed or another acting with the person killed which passion arises at
the time of the offense and is not solely the result of former provocation." Tex. Penal Code Ann.
§ 19.02(a)(2). "Adequate cause" is that "cause that would commonly produce a degree of anger,
rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of
cool reflection." Tex. Penal Code Ann. § 19.02(a)(1).

 In this case, the trial court could have reasonably concluded the evidence did not warrant a
sudden-passion instruction. Porter was the initial aggressor in the fight precipitating Kennedy's
death. Porter introduced a deadly weapon into the fracas. After he and Kennedy ended their scuffle,
Porter drew a gun and shot the unarmed Kennedy. Porter did not testify that he had acted out of
sudden fear, anger, or other emotion that was so intense that neither he nor any other normal human
being could have overcome such passion. Therefore, without such evidence coming from Porter or
some other source, the trial court had no evidence before it to mandate a sudden-passion instruction. 
We conclude the trial court did not err by failing to so instruct the jury.

 We reform the trial court's judgment to substitute "Penal Code" for "Property Code" and
affirm the judgment as reformed.


 

 Josh R. Morriss, III

 Chief Justice


Date Submitted: February 13, 2008

Date Decided: March 10, 2008


Do Not Publish


1. Crump testified that he called 9-1-1 for an ambulance following the shooting. Several others
testified about calling 9-1-1 after hearing the shooting. 
2. Miranda v. Arizona, 384 U.S. 436 (1966).
3. Neither party to this appeal has directed the Gregg County District Clerk to supplement the
record with a nunc pro tunc judgment from the trial court. See Hughes v. State, 493 S.W.2d 166,
170 (Tex. Crim. App. 1973) (trial court may issue judgment nunc pro tunc to correct clerical error);
State v. Dudley, 223 S.W.3d 717, 721-22 (Tex. App.--Tyler 2007, no pet.) (nunc pro tunc is correct
method for trial court to correct errors in judgment that are not product of judicial reasoning); see
also Tex. R. App. P. 34.5(c) (any party may request supplementation of appellate record). 
Accordingly, we assume this issue has not been made moot by the trial court's issuance of a corrected
judgment.


he finding of
January 1, 1998, is not so contrary to the great weight and preponderance of the evidence as to be
clearly wrong and unjust. Since the discovery date is factually sufficient, we will not address
UPRC's remaining counter-arguments concerning the negligence claim. Because the Burkes'
negligence claim was filed against UPRC more than two years after the accrual of that cause of
action, it is barred by the statute of limitations. See Tex. Civ. Prac. & Rem. Code Ann. § 16.003
(Vernon 2002).
The Burkes' Attorney's Fees
            The Burkes argue that the award of zero dollars in attorney's fees is against the great weight
and preponderance of the evidence. UPRC argues the Burkes failed to preserve error, if any. No
motion for new trial was filed concerning the issue of attorney's fees. A motion for new trial must
be filed in order to preserve a factual sufficiency review. Tex. R. Civ. P. 324(b). The Burkes have
failed to preserve error concerning the issue of attorney's fees. Breach of Contract Theory
            In its first point of error, UPRC argues that the Burkes do not have a cause of action for
breach of contract. UPRC argues that the agreement only contains two promises by UPRC to the
Burkes. According to UPRC, the contract only requires it to pay ten dollars per acre for surface
access to conduct the operation and to pay for claims or damages arising from any testing done on
the Burkes' own land. The dispute concerning the contract issue revolves around whether the
contract term "seismic testing" is limited to testing done on the Burkes' land or whether it includes
UPRC's actions in conducting the survey, which included the Burkes' land. We conclude that the
contract includes more than merely surface activity.
            UPRC argues that there is no evidence that any seismic work on the Burkes' land affected or
even approached the water well. Instead, the focus of the trial was on a line of shot holes across the
road on a neighbor's property. These holes were just across the property line and relatively close to
the Burkes' water well. UPRC contends these activities are not covered by the contract because they
were not conducted on the Burkes' land.
            In response to Question 1, the jury found UPRC failed to comply with the agreement with
the Burkes. Question Number 1 asked:
Did Union Pacific Resources Company fail to comply with the agreement
dated September 22, 1997 between itself and the Burkes?
 
Answer "Yes" or "No".
 
Answer: Yes 

The agreement in question, which UPRC refers to as the "testing agreement," provides specifically:
We respectfully request permission to conduct a Seismograph survey across surface
and or mineral property(s) owned and/or leased by you as defined according to the
following legal description;
 
                        . . . .
 
Our operations will be conducted in accordance with standard Geophysical practices
and in a prudent and careful manner, and we agree to hold you free and harmless
from any and all claims and damages that may result from our work by virtue of your
permission herein granted, including all land owned or claimed by lessor adjacent or
contiguous to the land particularly described above, whether the same be in said
survey or surveys or in adjacent surveys although not included within the boundaries
of the land particularly described above.

            When interpreting contracts, the primary concern of this Court is to give effect to the parties'
intentions as expressed in the contract. CMS Partners, Ltd. v. Plumrose USA, Inc., 101 S.W.3d 730,
732 (Tex. App.—Texarkana 2003, no pet.). In determining the parties' intentions, intent must be
taken from the agreement itself, not from the parties' present interpretation. Id. The agreement will
be enforced as created regardless of whether the parties contracted wisely. Id. 
            UPRC urges this Court to adopt a construction of this agreement which would only produce
liability for the testing actually done on the Burkes' land. Under this construction, the contract
exposes UPRC to liability only for damage caused by testing done on the Burkes' land, not for testing
done on a neighbor's land. UPRC contends the contract is limited to work being done "by virtue of
your permission herein granted." The "hold harmless" clause includes the clarification "including
all land owned or claimed by lessor . . . ." Further, the clause refers to "property described
hereinabove," i.e., the Burkes' ninety-four-acre tract. While the "hold harmless" clause refers only
to operations occurring on the Burkes' land, we disagree that the objective intent of the entire
agreement does not apply to work done on someone else's land.
            The contract, as a whole, is not limited to surface activities on the Burkes' land. The contract
includes UPRC's actions in conducting the survey, which involves the Burkes' land. The contract
is a form contract clearly developed for both mineral and surface owners. There are several blanks
and boxes intended to designate whether permission is being obtained from a surface owner or a
mineral owner. Although the "hold harmless" clause may be limited to the Burkes' land, it is only
one clause in the contract. The objective intent of the parties was to require that the seismic testing
be conducted in a safe and prudent manner. This interpretation is reasonable because there are many
reasons UPRC would seek permission to conduct the seismic survey and would be willing to make
this promise to obtain the said permission.
            UPRC's argument fails because the objective intent of the standard practices clause is not
confined to activities on the Burkes' land. The contract as a whole applies to the survey, rather than
activities on the Burkes' land. The permit, the contract at issue, involves granting of permission by
the Burkes to UPRC to conduct a "seismic survey" across the Burkes' land. Courts should give terms
their plain, ordinary, and generally accepted meaning unless the contract indicates otherwise. 
Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996). Technical words and terms
in a contract are to be construed by the courts as those terms are usually understood by persons in
the profession or business to which the terms relate, unless it is clear that the terms were used in a
different sense. Oil Ins. Ass'n v. Royal Indem. Co., 519 S.W.2d 148, 150 (Tex. Civ. App.—Houston
[14th Dist.] 1975, writ ref'd n.r.e.); Frost v. Martin, 203 S.W. 72, 74 (Tex. Civ. App.—Fort Worth
1918, no writ). The United States Department of Agriculture pamphlet on geophysical operations,
which was introduced into evidence, defines seismic testing as a method of exploring for
hydrocarbons under the ground. Seismic testing relies on the mathematical analysis of various
echoes or reflective waves that are generated when an explosive charge is detonated at the bottom
of a deep hole. Thus, seismic testing involves more than mere surface activity. It involves surface
activities such as detonation of explosives and the drilling of holes, as well as the waves generated
by the explosions and the analysis of these waves. We conclude that the phrase "seismic testing" in
the contract includes generating reflective underground waves.
            The Burkes argued on appeal and at trial that UPRC is liable because it did not conform to
the "standard Geophysical practices" or conduct the blasting "in a prudent and careful manner." 
Although the standard practices clause is in the same sentence as the hold harmless clause, they are
contained in independent clauses. An independent clause can stand alone as a sentence. William
Strunk, Jr. & E. B. White, The Elements of Style, p. 5 (4th ed. 2000). The qualifying language
that may limit the hold harmless clause to activities on the Burkes' land does not apply to the
standard practices clause. Therefore, the standard practices clause applies to the "seismic survey,"
which includes subsurface activities such as the generation and measurement of the waves. 
            The standard practices clause creates an express warranty guaranteeing that UPRC's actions
and the actions of its agents will be "conducted in accordance with standard Geophysical practices
and in a prudent and careful manner." The Burkes presented ample evidence that UPRC's activities
were not conducted in a "prudent and careful manner" and some evidence that they were not
conducted in accordance with "standard Geophysical practices." Therefore, the Burkes did have a
cause of action for breach of the contract.
Third-Party Beneficiary Theory
            At the end of trial, the Burkes requested a trial amendment to add a cause of action based on
being a third-party beneficiary to a contract between UPRC and Schlumberger's Geco-Prakla
division. The Burkes argue they are third-party beneficiaries because the contract clearly intends to
secure payment of damages to the Burkes' well. UPRC responds the agreement is merely an
indemnity agreement between it and Schlumberger.
            There is a presumption against, not in favor of, third-party beneficiary agreements. MCI
Telecomm. Corp. v. Tex. Util. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999); Carson Energy, Inc. v.
Riverway Bank, 100 S.W.3d 591, 600 (Tex. App.—Texarkana 2003, pet. denied). Absent clear
indication in the contract that the parties intended to confer a direct benefit to the third party, the
third party may not maintain an action as a third-party beneficiary. MCI Telecomm. Corp., 995
S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600; Hurley v. Lano Int'l, Inc., 569 S.W.2d 602,
603 (Tex. Civ. App.—Texarkana 1978, writ ref'd n.r.e.). A third party may recover on a contract
made by other parties only if the parties intended to secure some benefit to that third party and only
if the parties entered into the contract directly for the third party's benefit. MCI Telecomm. Corp.,
995 S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600; Hurley, 569 S.W.2d at 603.
            To qualify as one for whose benefit the contract was made, the third party must show he or
she is either a donee or creditor beneficiary of the contract, i.e., not one who is benefitted only
incidentally. MCI Telecomm. Corp., 995 S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600;
Hurley, 569 S.W.2d at 603. One is a donee beneficiary if the performance promised will, when
rendered, come to him or her as a pure donation. MCI Telecomm. Corp., 995 S.W.2d at 651; Carson
Energy, Inc., 100 S.W.3d at 600. If, on the other hand, that performance will come to him or her in
satisfaction of a legal duty owed to him or her by the promisee, he or she is a creditor beneficiary. 
MCI Telecomm. Corp., 995 S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600. The duty to
creditor beneficiaries may be an "indebtedness, contractual obligation or other legally enforceable
commitment" owed to the third party. MCI Telecomm. Corp., 995 S.W.2d at 651; Carson Energy,
Inc., 100 S.W.3d at 600; Hurley, 569 S.W.2d at 603. In determining whether a third party can
enforce a contract, the intention of the contracting parties is controlling. A court will not create a
third-party beneficiary contract by implication. MCI Telecomm. Corp., 995 S.W.2d at 651; Carson
Energy, Inc., 100 S.W.3d at 600. The intention to contract or confer a direct benefit to a third party
must be clearly and fully spelled out, or enforcement by the third party must be denied. MCI
Telecomm. Corp., 995 S.W.2d at 651; Carson Energy, Inc., 100 S.W.3d at 600; Hurley, 569 S.W.2d
at 603. Consequently, a presumption exists that parties contracted for themselves unless it "clearly
appears" they intended a third party to benefit from the contract. MCI Telecomm. Corp., 995 S.W.2d
at 651; Carson Energy, Inc., 100 S.W.3d at 600; Hurley, 569 S.W.2d at 603.
 
            In the case at bar, the contract was formed between Schlumberger's Geco-Prakla division and
UPRC. The Burkes do not argue they were a party to the contract. The contract provides:
U.P.R.C. has agreed to the following distances and charge sizes in the vicinity of a
new water well that was drilled after the shot points were drilled. This water well is
situated on the North side of highway 1798 and between receiver lines 412 and 424. 
This well was drilled to service a new cattle feedlot. It was drilled to a depth of 600'
and cased with PVC casing. Geco-Prakla understands that U.P.R.C assumes all
responsibility for any damages or costs to this water well resulting from Shot Points
shot in the vicinity's [sic] as listed below:

                        . . . .

                                                            Agreed and accepted on Nov. 23, 1997.
                                                            by /s/ B.D. Bates 

There is no language in the contract indicating the contract was for the benefit of the Burkes. An
indemnity agreement does not create third-party beneficiary status unless the third party is a creditor
beneficiary and the contract was formed for his or her benefit. MCI Telecomm. Corp., 995 S.W.2d
at 651; Hurley, 569 S.W.2d at 603. The agreement simply does not support a claim of third-party
beneficiary for the Burkes. Without privity of contract or a clear indication the Burkes were
third-party beneficiaries, the Burkes cannot recover on this contract.
The Burkes' Pleadings
            In its third point of error, UPRC argues that the pleadings were insufficient as to the damages
to the dead cattle and weight loss to the cattle. Because the Burkes did not include the deceased
cattle and the decreased weight loss to the cattle as damages in their petition, UPRC argues these
damages cannot be awarded.
            The Burkes contend the damages due to the dead cattle and decreased weight gain are direct
damages rather than special damages. The case cited by the Burkes, i.e., Humble Pipe Line Co. v.
Day, 172 S.W.2d 356, 358 (Tex. Civ. App.—Waco 1943, writ ref'd w.o.m.), did involve both dead
cattle and weight loss to the cattle. However, the discussion of special damages is limited to the
decrease in market value of the land. In Day, a landowner brought suit for damage to her land and
cattle caused by large quantities of crude oil which escaped from a nearby pipeline and settled in and
near a creek running through her farm. Id. Humble argued that the decreased value of the land was
a special damage, and the court held that the damage to the land was a direct damage because it was
reasonably foreseeable. Id. Day does not stand for the proposition that the dead cattle and weight
loss were direct damages, although the court did allow Day to recover for the dead cattle and weight
loss. 
            Our analysis is that the dead cattle and the decreased weight gain of the surviving cattle are
special damages rather than direct or general damages. Direct damages "flow naturally and
necessarily" from the wrong and "compensate the plaintiff for the loss that is conclusively presumed
to have been foreseen by the defendant from his wrongful act." Arthur Andersen & Co. v. Perry
Equip. Corp., 945 S.W.2d 812, 816 (Tex. 1997). "Special damages are those that proximately result
from the defendant's wrongful conduct but are of such an unusual nature that they would normally
vary with the circumstances of the individual case in which they occur." Sherrod v. Bailey, 580
S.W.2d 24, 28 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). Special damages are
those damages "which result naturally, but not necessarily, from the acts complained of." Henry S.
Miller Co. v. Bynum, 836 S.W.2d 160, 163 (Tex. 1992) (Phillips, J., concurring); see Arthur
Andersen & Co., 945 S.W.2d at 816. 
            The death of cattle and the losses incurred due to the decreased weight gain do not
necessarily flow from damage to a water well. They are damages which will normally vary with the
circumstances of each case. The damages resulted from the sand, which caused the calves stress and
increased their susceptibility to illnesses. The damages did not naturally and necessarily flow from
the damage to the well. Further, the losses due to decreased weight gain are analogous to lost profits,
which have consistently been held to be special damages in Texas. See Naegeli Transp. v. Gulf
Electroquip, Inc., 853 S.W.2d 737, 739 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Our
conclusion is that the damages due to the dead cattle and the decreased weight gain of the cattle are
special damages.
            Under the common law, "special damages" are not recoverable unless the defendant had
notice that the plaintiff would suffer such damages. Id. "When items of special damage are claimed,
they shall be specifically stated." Tex. R. Civ. P. 56. In order to be recoverable, special damages
must be pled. Lesikar v. Rappeport, 33 S.W.3d 282, 306 n.1 (Tex. App.—Texarkana 2000, pet.
denied); see Bynum, 836 S.W.2d at 163 (Phillips, J., concurring). 
            Before our analysis progresses any further, we must determine whether error was preserved. 
Rule 90 of the Texas Rules of Civil Procedure requires that any defect "either of form or of
substance" must be "pointed out by exception in writing" and brought to the attention of the trial
court. Tex. R. Civ. P. 90. UPRC did not specially except to the pleadings or object to the
introduction of evidence concerning the special damages. However, UPRC did object to the
submission of the damage question to the jury on the basis that the damages resulting from the dead
cattle and the decreased weight gain of the cattle were not "supported by Plaintiffs' general
pleadings." Because UPRC objected to the submission of the issue to the jury, the issue was not
tried by consent. See Tex. R. Civ. P. 67; see also Matthews v. Gen. Accident Fire & Life Assurance
Corp., 161 Tex. 622, 343 S.W.2d 251, 255 (1961); Harkey v. Tex. Employers' Ins. Ass'n, 146 Tex.
504, 208 S.W.2d 919, 923 (1948). Therefore, error was preserved for our review.
            The trial court, though, did not abuse its discretion in submitting the question concerning
damages to the jury. In order to warrant submission to the jury, the issues must be raised by both
the pleadings and the evidence. Tex. R. Civ. P. 278; City of Princeton v. Abbott, 792 S.W.2d 161,
167 (Tex. App.—Dallas 1990, writ denied). The sufficiency of the pleadings is judged based on
whether they provide the opponent with fair and adequate notice. Roark v. Allen, 633 S.W.2d 804,
809–10 (Tex. 1982); Howell v. Mauzy, 899 S.W.2d 690, 707 (Tex. App.—Austin 1994, writ denied). 
The purpose of this rule is to allow an opposing party to adequately prepare for trial. Roark, 633
S.W.2d at 810. "Fair notice" requires that "an opposing attorney of reasonable competence" can
ascertain the nature and basic issues of the controversy. City of Alamo v. Casas, 960 S.W.2d 240,
251 (Tex. App.—Corpus Christi 1997, pet. denied). In order for the pleadings to be sufficient, the
defendants must have fair notice of the special damages being asserted. See Sherrod, 580 S.W.2d
at 28 (holding that defendants did not have fair notice that "damages to the improvements" were
being sought). 
            The Burkes argue that the DTPA demand letter, which was attached to the pleadings, is
sufficient to meet the pleading requirement. A party may attach and incorporate into its pleadings
written instruments "constituting, in whole or in part, the claim sued on, or the matter set up in
defense." Tex. R. Civ. P. 59. UPRC contends that the demand letter cannot be incorporated into
the pleadings because it does not constitute the claim sued on. The notice requirement of the DTPA
must be pled. Hines v. Hash, 843 S.W.2d 464, 467 (Tex. 1992). Because notice must be pled in a
DTPA action, we conclude that notice under the DTPA forms part of the DTPA claim or a matter
concerning a defense. See Houston Cmty. Coll. Sys. v. Schneider, 67 S.W.3d 241, 242–43 (Tex.
App.—Houston [1st Dist.] 2000, pet. denied) (copies of worker's compensation proceedings
incorporated into the pleadings); Skepnek v. Mynatt, 8 S.W.3d 377 (Tex. App.—El Paso 1999, pet.
denied) (attached affidavit in support of special appearance deemed incorporated). Therefore, the
DTPA demand letter was incorporated as part of the Burkes' DTPA claim against PWW. The
remaining issue is whether the enumeration of special damages in the DTPA claim is sufficient to
plead those special damages against another defendant, specifically UPRC, in a different cause of
action, specifically breach of contract.
            The incorporation of the DTPA demand letter provided UPRC with fair notice of the special
damages. In the attached letter, the Burkes listed the following damages: "the Burkes waited over
a year without potable water and suffered a loss of use of their residence, expenses in transporting
cattle, weight loss on cattle, and death of cattle . . . ." In their petition, the Burkes alleged:
The damages suffered by Plaintiffs in connection with the Defendants'
improper, wrongful, and/or negligent conduct in this case are in excess of the
minimum jurisdictional limits of this Court. At this point in time, Plaintiffs' damages
are in an amount not less than $204,321.50; however, Plaintiffs expressly and
specifically reserve the right to amend and/or supplement the aforementioned
damages figure as this litigation progresses.

This is the only paragraph in the petition other than the attachment which addresses the Burkes'
damages. The petition clearly indicates that the same damages are being brought against all
defendants. The Burkes use the plural form of "defendants," indicating that the paragraph is referring
to multiple defendants. Further, it is clear that all of the injuries came from the same injury, i.e., the
sand in the well. When there are no special exceptions, a petition will be construed liberally in favor
of the pleader. Roark, 633 S.W.2d at 810. Since the petition alleges the same damage amount
against all defendants, any attorney of reasonable competence would have fair notice that the special
damages enumerated in the attached DTPA letter are being asserted against all the defendants. 
            UPRC cites Employers Casualty Co. v. Transport Insurance Co. for the proposition that the
attachment does not provide fair notice. Employers Cas. Co. v. Transport Ins. Co., 444 S.W.2d 606,
610 (Tex. 1969). Employers Casualty, though, held that neither the pleading nor the attachment gave
fair notice that the plaintiff was seeking "recovery in subrogation." Employers Cas. Co., 444 S.W.2d
at 610. In this case, the attachment does provide fair notice that special damages for the dead cattle
and the decreased weight gain of the cattle were being sought. Further, the depositions of Russell
and Lori Burke indicate that UPRC was well aware that the Burkes were seeking damages for the
dead cattle and the decreased weight gain of the surviving cattle.
            In this case, the pleading against PWW, which specifically pled the special damages,
provided fair notice to UPRC that the same special damages would be asserted against them. We
are not holding that special damages pled against one defendant will always be sufficient against
other defendants. However, in this case, the pleading gave fair notice of the special damages to
UPRC. Because we are to liberally construe pleadings in favor of the pleader in absence of any
written special exceptions, the pleadings did specifically plead the special damages.



Sufficiency of the Evidence of the Damages
            In its points of error four and five, UPRC argues there is insufficient evidence of the actual
damages. The jury awarded the Burkes $1.5 million in actual damages. Question B asked the jury:
What sum of money, if paid now in cash, would fairly and reasonably
compensate Burkes for their damages, if any, resulting from the occurrence in
question?

                        . . . . 
 
Consider the following elements of damages and none other:
a.losses incurred on weight gain of cattle that were a natural, probable,
and foreseeable consequence of Union Pacific Resources failure to
comply
b.losses incurred on dead cattle that were a natural, probable, and
foreseeable consequence of Union Pacific Resources failure to
comply
c.reasonable and necessary cost incurred in repairing the water well in
question

At trial, the Burkes' counsel requested $700,000.00 for the decreased weight gain, $400,000.00 for
the dead cattle, and $7,600.00 for the well repair. The Burkes did not request damages related to
increased veterinary expenses. In total, the Burkes requested that the jury award $1,107,600.00 in
actual damages. The jury awarded $1.5 million. 
            UPRC argues there is no evidence of "reasonable and necessary" costs to repair the well. 
UPRC asks us to "delete" and "overturn" the damage finding of $1.5 million. UPRC also alleges the
award was excessive and not supported by the evidence. These allegations challenge both the legal
and factual sufficiency of the evidence. UPRC preserved the error for both the legal and factual
sufficiency reviews. In its motion for judgment notwithstanding the verdict, it argued there was no
evidence of the damages and objected to the submission of the jury question on the basis that there
was no evidence. UPRC argued in its motion for new trial that the damages were excessive. 
            On appeal, the Burkes argue that the damage award can be supported by the evidence. The
evidence was that the Burkes processed 14,000 cattle in the operation. We understand the Burkes'
argument concerning damages as follows: 
            Weight Gain:                                      14,000 x $50.00 = $700,000
            Veterinary Expenses (Weight Gain): 14,000 x $40.00 = $560,000
            Dead Cattle:                                        500 replaced cattle x $500 = $250,000
            Well Repair:                                       $7,800
                                                                        $1,617,800

Thus, the Burkes argue the jury could have awarded a total of $1,617,800.00. We note the Burkes
are not contending the jury could have awarded damages for dead cattle which the Burkes did not
replace. Lori Burke testified that 1,200 to 1,300 cattle died. Of the dead cattle, the Burkes replaced
approximately 500. It is unclear as to the ownership of the remaining 800 dead cattle. It appears that
some of the cattle were owned in some form of partnership.
            On appeal, the Burkes argue that the jury's award is supported by the evidence because of the
increased cost of veterinary care caused by the sand in the water. We disagree that the veterinary
expenses can be awarded as part of the loss due to the decreased weight gain element of damage. 
The Burkes contend that the veterinary expenses are related to decreased weight gain of the cattle. 
Our conclusion is that the veterinary expenses are too dissimilar from the decreased weight gain to
be awarded under that element. No question was submitted to the jury concerning the increased
veterinary expenses. Because the veterinary expenses are not attributable to "losses incurred on
weight gain" of the cattle, they cannot be used to support the award.
            In addition, the amount of the increased veterinary costs argued by the Burkes is unsound. 
The forty-dollar figure asserted by the Burkes referred to testimony that, when a calf died, the calf
that replaced it would then have to be vaccinated. This resulted in an increased cost of forty dollars
per head rather than twenty dollars per head. The testimony pertained only to the replaced cattle. 
Thus, this evidence provides evidence of damages in the amount of $10,000.00 (500 replaced cattle
x ($40.00–$20.00)), rather than $560,000.00. The veterinarian testified that vaccination costs were
increased by the lack of water, because the medicines would not perform as well when cattle were
dehydrated. The Burkes have not shown where evidence of these increases can be found in the
record. Further, as discussed above, the Burkes did not submit a question concerning veterinary
expenses.
            The remaining damages asserted by the Burkes are supported by the evidence. As a result
of the problems with sand in the well, Lori Burke testified their cost to increase a calf's weight was
much greater than the average cost. On average, the calves in their operations gained only one and
a half pounds per day instead of the expected two and a half pounds. In total, the decreased weight
gain resulted in a loss of twenty-five dollars per head per month. Since each calf stayed at the feedlot
an average of two months, the Burkes lost fifty dollars per head. The Burkes replaced approximately
500 head of the dead cattle for their customers. Lori Burke testified that the cattle were selling on
average between $400.00 and $500.00 per head. Russell testified that it cost $7,800.00 to repair the
well. Thus, the maximum amount supported by the evidence is as follows:
            Decreased Weight Gain - 14,000 head x $50/per head                       $ 700,000
            Dead Cattle: 
                        Replaced Cattle - 500 head x $500/per head                          $ 250,000
            Well Repair -  7,800                                                                           $ 7,800
$ 957,800

These calculations assume that cattle were selling at the maximum price of $500.00 per head. Thus,
the jury's award of $1.5 million is so contrary to the great weight and preponderance of the evidence
as to be clearly wrong and manifestly unjust. 
Settlement Credit
            UPRC argues it is entitled to credit for the Schlumberger settlement. The Burkes and PWW
settled with Schlumberger before trial for $125,000.00. Of this amount, $13,500.00 was awarded
to PWW. UPRC argues it is entitled to a settlement credit under the one satisfaction rule. The
Burkes contend the Schlumberger settlement could have been attributable to damages other than
those asserted against UPRC.
            When a single, indivisible injury occurs, the plaintiff may recover only once for that injury. 
See Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 8 (Tex. 1991); Facciolla v. Linbeck Constr.
Corp., 968 S.W.2d 435, 449 (Tex. App.—Texarkana 1998, no pet.). The party seeking a settlement
credit has the burden to prove its right to such a credit. Mobil Oil Corp. v. Ellender, 968 S.W.2d
917, 927 (Tex. 1998); Cohen v. Arthur Andersen, L.L.P., 106 S.W.3d 304, 310 (Tex. App.—Houston
[1st Dist.] 2003, no pet.). The party must prove the settlement amount and introduce in the record
either the settlement agreement or some evidence of the settlement amount. Ellender, 968 S.W.2d
at 927; Cohen, 106 S.W.3d at 310. "If the nonsettling party meets this burden, the burden shifts to
the plaintiff to tender a valid settlement agreement allocating the settlement between (1) damages
for which the settling and nonsettling defendant [sic] are jointly liable, and (2) damages for which
only the settling party was liable." Cohen, 106 S.W.3d at 310; see Crown Life Ins. Co. v. Casteel,
22 S.W.3d 378, 391–92 (Tex. 2000). The plaintiff is in the better position to prove the proper
allocation of the settlement. Ellender, 968 S.W.2d at 928. If the plaintiff fails to satisfy this burden,
then the nonsettling party is entitled to a credit equaling the entire settlement amount. Cohen, 106
S.W.3d at 310; see Ellender, 968 S.W.2d at 928.
            UPRC introduced the settlement agreement into the record. Therefore, the burden shifted
to the Burkes to prove the damages for which only the settling party was liable. On appeal, the
Burkes argue that the Schlumberger settlement can be attributed to damages for loss of the use of
their residence and additional costs in transporting cattle. Although pled in their eighth amended
petition, neither of these damages was submitted to the jury. However, the record does not indicate
the Burkes made this argument to the trial court. The Burkes argued to the trial court that UPRC was
responsible for proving the proper allocation of the settlement. Because the Burkes failed to meet
their burden of proving the damages solely attributable to Schlumberger, the full amount of the
settlement should be credited toward the judgment. The award should be reduced by $111,500.00.
PWW's Tortious Interference Claim
            UPRC contends in its seventh point of error that PWW's tortious interference with
contractual relations claim is barred by the statute of limitations. UPRC argues that the discovery
rule does not apply to claims of tortious interference as a matter of law because these types of
injuries are neither inherently undiscoverable nor objectively verifiable. This Court has noted that
the discovery rule is a "very limited exception" to the statute of limitations. Schindley, 13 S.W.3d
at 67. The discovery rule only applies when the nature of the plaintiff's injury is both inherently
undiscoverable and objectively verifiable. Altai, Inc., 918 S.W.2d at 456. As discussed below, there
is sufficient evidence to support the jury's finding as to the discovery date of the injury. For purposes
of this discussion, we will assume that the discovery rule applies.
            PWW argues that tortious interference should be governed under the residual statute of
limitations, Section 16.051, instead of Section 16.003. Section 16.051 provides that "[e]very action
for which there is no express limitations period, except an action for the recovery of real property,
must be brought not later than four years after the day the cause of action accrues." Tex. Civ. Prac.
& Rem. Code Ann. § 16.051 (Vernon 1997). In Dickson Construction, Inc., this Court noted that
the Texas Supreme Court may have erred in First National Bank of Eagle Pass v. Levine. Dickson
Constr., Inc., 960 S.W.2d at 849; see First Nat'l Bank of Eagle Pass v. Levine, 721 S.W.2d 287, 289
(Tex. 1986) (holding that tortious interference with business relations was within the meaning of
trespass in Section 16.003). In our opinion, we criticized the Texas Supreme Court's interpretation
of the statute to require a tortious interference cause of action to be brought within two years. 
Dickson Constr., Inc., 960 S.W.2d at 849. As we held in Dickson Construction, we adhere to the
application of Section 16.003 to tortious interference claims until the Texas Supreme Court changes
its interpretation. 
            Even assuming the discovery rule applies, there is sufficient evidence to support the jury's
answer concerning the discovery date of the injury. The jury found that PWW knew or should have
known of the tortious interference on January 1, 1998. We believe this finding is supported by the
evidence. As previously discussed, Pritchett was concerned about the seismic testing and informed
the crew about the water well. When PWW drilled the well in December 1997, it produced potable
water without sand. However, when the pump was installed around the beginning of January 1998,
the well water contained excessive amounts of sand. Pritchett filed an affidavit earlier in the case
in which he stated that Russell Burke accused the seismograph survey of tearing up the well when
the pump was installed. At this point, a rational juror could have concluded PWW knew or should
have known that a third party had committed tortious acts. Further, the great weight and
preponderance of the evidence is not so contrary to the jury's conclusion that it indicates the result
is clearly wrong. PWW originally countersued UPRC on August 28, 2000, which was more than
two years from January 1, 1998. Therefore, the statute of limitations bars PWW's claim even if the
discovery rule applies.


 Because the statute of limitations is dispositive, we will not address UPRC's
remaining points of error.
PWW's Attorney's Fees
            PWW also contends it can recover attorney's fees because it prevailed against the Burkes on
the breach of contract claim. PWW did not request recovery at the trial court level for attorney's fees
based on breach of contract. No question solely concerning attorney's fees was submitted to the jury. 
The question that was submitted to the jury was clearly intended to be for the tortious interference
claim and combined both attorney's fees and the cost of the attempted repairs to the well. We deny
PWW's claim for attorney's fees.
Conclusion
            Both the Burkes' negligence claim and PWW's tortious interference with business relations
claim are barred by the statute of limitations. We render a take-nothing judgment concerning PWW's
tortious interference claim. The evidence is factually insufficient to support the Burkes' recovery of
$1.5 million for contract damages. Further, the trial court abused its discretion in not awarding a
settlement credit to UPRC in the amount of $111,500.00. If the Burkes, within fifteen days from the
date of our opinion, file a remittitur of $653,700.00 from the damages awarded by the trial court, we
will modify the trial court's judgment to award the Burkes a recovery of $842,300.00 in damages,
plus prejudgment interest of $358,552.84, and postjudgment interest at the rate of ten percent per
annum. If the Burkes fail to remit $653,700.00, the judgment will be reversed, and the cause
remanded for a new trial.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          March 31, 2004
Date Decided:             April 16, 2004



OPINION ON MOTION FOR REHEARING

            Both UPRC and PWW have filed motions for rehearing. PWW argues this Court erred in
holding that its suit was barred by the statute of limitations. UPRC argues this Court erred in not
considering whether there was sufficient evidence that the repair costs to the well were reasonable
and necessary and in awarding interest at a rate of ten percent. In its supplement to its motion for
rehearing, UPRC argues that this Court erred in allocating the costs among the parties and argues
for the first time on appeal that Russell and Lori Burke lack standing. We overrule the motions for
rehearing.
PWW's Motion for Rehearing
            PWW contends we erred in holding that its suit was barred by the statute of limitations. 
PWW argues that it was not until it was sued for breach of contract that it became aware of the
tortious interference with business relations. This argument fails because, even if the discovery rule
applies, the test is when PWW became aware of interference with its business relationship rather
than when the extent of the damages became known. The discovery rule exception defers accrual
of a cause of action until the plaintiff knew or should have known of the facts giving rise to the cause
of action. Trinity River Auth. v. URS Consultants, Inc., 889 S.W.2d 259, 262 (Tex. 1994); Dickson
Constr., Inc. v. Fid. & Deposit Co., 960 S.W.2d 845, 850 (Tex. App.—Texarkana 1997, no pet.). 
The tortious interference with business relations occurred when the well was damaged, not when the
Burkes filed suit. There is sufficient evidence to support the jury's determination that PWW knew
or should have known by January 1, 1998, that UPRC had damaged the well and thus interfered with
its contract. The fact that the extent of the damages caused by the interference did not become
apparent until it was sued by the Burkes does not toll the statute of limitations. 
            PWW also contends the effect of our ruling violates the open courts provision of the Texas
Constitution. See Tex. Const. art. I, § 13; Trinity River Auth., 889 S.W.2d at 261; Sax v. Votteler,
648 S.W.2d 661, 665 (Tex. 1983). In Trinity River Authority, the Texas Supreme Court held that
the statute of limitations did not violate the open courts provision. Trinity River Auth., 889 S.W.2d
at 261. In Sax, the Texas Supreme Court held that a limitations statute limiting a minor's opportunity
to file a malpractice suit violated the open courts provision because it effectively abolished the
minor's right to assert the cause of action. Sax, 648 S.W.2d at 667. Our situation is distinguishable
because PWW could have sued when it became aware that the well was damaged even though PWW
did not know the full extent of the damages at that time.
            PWW suggests that we 1) allow an equitable tolling exception, 2) apply the residual
limitations statute, or 3) apply the discovery rule. We analyzed the statute of limitations based on
the discovery rule. We also rejected the residual limitations statute based on the most recent Texas
Supreme Court analysis. See First Nat'l Bank of Eagle Pass v. Levine, 721 S.W.2d 287, 289 (Tex.
1986). PWW did not assert any equitable tolling exception at the trial court level.
            We overrule PWW's motion for rehearing.  
UPRC's Motion for Rehearing
            In its original motion for rehearing, UPRC argues that our opinion failed to address whether
the water well repair cost was reasonable and necessary. UPRC also contends the judgment interest
rate should be five percent rather than ten percent. 
            UPRC's first contention is that the Burkes failed to show that the cost of $7,800.00 to repair
the well was reasonable and necessary. A party seeking recovery for the costs of repairs must prove
they are reasonable. Fort Worth Hotel Ltd. P'ship v. Enserch Corp., 977 S.W.2d 746, 762 (Tex.
App.—Fort Worth 1998, no pet.). A party does not have to use the magic words "reasonable and
necessary," but need only present sufficient evidence to justify a jury's finding. Id. The Burkes
presented evidence that the well was pumping excessive amounts of sand, which made the water
unsuitable for the use intended. Evidence at trial indicated this problem was caused by a hole or
similar disruption in the screen. Jere Pritchett testified he made several attempts to repair the well,
but was unsuccessful. Although he did not charge the Burkes, Pritchett incurred costs of $10,000.00
in attempting to repair the well. Travis Russell was able to patch the well and charged the Burkes
$7,800.00 for the patch. The patch cost less than Pritchett's unsuccessful repairs and much less than
the original cost of the well. Based on this evidence, a rational juror could have concluded that the
repairs were reasonable and necessary, and such a conclusion is not against the great weight and
preponderance of the evidence.
            UPRC's second contention is that the judgment interest rate should be five percent rather than
ten percent. UPRC argues that the new version of Tex. Fin. Code Ann. § 304.003(c) applies
because this Court's opinion constitutes a judgment and the new provision applies to a judgment
which will be "signed or subject to appeal." See Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2,
2003 Tex. Gen. Laws 2097. 
            During the last regular session, the Texas Legislature amended the postjudgment interest rate. 
See Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096–97 (codified at
Tex. Fin. Code Ann. § 304.003(c) (Vernon Supp. 2004)). Section 304.003(c) of the Texas Finance
Code now provides:
(c)The postjudgment interest rate is:
(1) the prime rate as published by the Federal Reserve Bank of New
York on the date of computation;
(2) five percent a year if the prime rate as published by the Federal
Reserve Bank of New York described by Subdivision (1) is less than five
percent; or
(3) 15 percent a year if the prime rate as published by the Federal
Reserve Bank of New York described by Subdivision (1) is more than 15
percent.

Tex. Fin. Code Ann. § 304.003(c).
            The interpretation of a statute is a question of law. In re Canales, 52 S.W.3d 698, 701 (Tex.
2001) (orig. proceeding). The Fort Worth Court of Appeals has held that the amendments apply only
"where a judgment is signed on [or] after the effective date of the Act and to cases where a judgment
becomes subject to appeal, i.e., capable of being appealed, on or after the effective date of the Act." 
Columbia Med. Ctr. v. Bush, 122 S.W.3d 835, 865 (Tex. App.—Fort Worth 2003, pet. denied); see
Warrantech Corp. v. Computer Adapters Servs., No. 02-03-002-CV, 2004 Tex. App. LEXIS 3212
(Tex. App.—Fort Worth Apr. 8, 2004, no pet. h.); see also Utts v. Short, No. 03-03-00512-CV, 2004
Tex. App. LEXIS 2874 (Tex. App.—Austin Apr. 1, 2004, no pet. h.) (not designated for
publication). 
            We note that all of our sister courts' opinions affirmed the judgments of the trial courts and
that we reversed and rendered concerning PWW and suggested a remittitur concerning UPRC's
appeal. However, our sister courts' opinions indicate that "judgment" in the act refers to the trial
court judgment rather than a judgment by a court of appeals. In Columbia Medical Center, the Fort
Worth Court of Appeals held that "[t]he plain meaning of the phrase 'subject to an appeal' when used
to describe a judgment traditionally means that the judgment fully and finally disposes of all parties
and all issues before the trial court and therefore is capable of being appealed." Columbia Med. Ctr.,
122 S.W.3d at 865. We hold that the new version of Section 304.003(c) applies to a case in which
a final judgment is signed in the trial court or subject to appeal from the trial court on or after June
20, 2003. Since the judgment was signed by the trial court and appeal was taken well before the
effective date of the new version of Section 304.003(c), it does not apply.
            The trial court signed the final judgment in this case January 10, 2003. This judgment
contained a prejudgment and postjudgment interest rate of ten percent. At the time the judgment was
signed in the trial court, Section 304.003(c) provided:
(c)The postjudgment interest rate is:
(1) the auction rate quoted on a discount basis for 52-week treasury
bills issued by the United States government as most recently published by
the Federal Reserve Board before the date of computation;
(2) 10 percent a year if the auction rate described by Subdivision (1)
is less than 10 percent; or
(3) 20 percent a year if the auction rate described by Subdivision (1)
is more than 20 percent.
Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.18, 1999 Tex. Gen. Laws 222, 232 (amended
2003) (current version at Tex. Fin. Code Ann. § 304.003(c)). Thus, the applicable interest rate was
ten percent. We overrule UPRC's motion for rehearing.
UPRC's Supplement to Motion for Rehearing
            In its supplement to its motion for rehearing, UPRC alleges two more errors in this Court's
opinion. UPRC contends that we erred in allocating the costs among the parties and that the Burkes
lack standing to pursue the appeal.
            The first alleged error argued by UPRC is that this Court erred in allocating the costs of the
appeal among the parties. This Court ordered UPRC to pay one half of the costs, the Burkes to pay
one third of the costs; and for PWW to pay one sixth of the costs. UPRC argues that we should have
applied Rule 139 of the Texas Rules of Civil Procedure and ordered that the Burkes and PWW pay
the costs. UPRC argues that, since Rule 139 is more specific than Rule 43.4 of the Rules of
Appellate Procedure, it should govern the award of the costs. See Tex. R. Civ. P. 139; Tex. R. App.
P. 43.4.
            Rule 43.4 provides that a court of appeals should award costs to the prevailing party. Tex.
R. App. P. 43.4. We followed the prevailing party rule in allocating costs. However, no party
prevailed on all of the principal issues. Given that there were multiple appeals and multiple parties
prevailing, we allocated the costs accordingly.
            The general rule is that the specific rule will control over the general rule. See Tex. Gov't
Code Ann. § 311.026 (Vernon 1998). However, we cannot say that Rule 139 is more specific than
Rule 43.4. Both rules are comprehensive on their face. See Tex. R. Civ. P. 139; Tex. R. App. P. 43.4 
If the rules were irreconcilable, Rule 43.4 would govern as the more recent rule. See Tex. Gov't
Code Ann. § 311.025 (Vernon 1998). However, we believe the rules can be harmonized. When
presented with a potential conflict among different rules, the rules should be construed, if possible,
to give effect to both. 
            The rules can be harmonized because the court may award costs to the prevailing party,
otherwise as required by law, or otherwise for good cause. Rule 43.4 provides that the court "may
tax costs otherwise as required by law or for good cause." Tex. R. App. P. 43.4. The word "may"
indicates that such an action is at the discretion of the court. See Tex. Gov't Code Ann. § 311.016
(Vernon 1998). We conclude Rule 139 falls within the meaning of "otherwise required by law" and
could be followed at the court's discretion. However, the court may award costs other than to the
prevailing party based on "good cause." See Burns v. Bishop, 48 S.W.3d 459, 468 (Tex.
App.—Houston [14th Dist.] 2001, no pet.); Keene Corp. v. Gardner, 837 S.W.2d 224, 232 (Tex.
App.—Dallas 1992, writ denied); see also Lesikar v. Rappeport, 809 S.W.2d 246, 253 (Tex.
App.—Texarkana 1991, no writ) (op. on reh'g). Courts of appeals have considerable discretion in
taxing costs on appeal. Save Our Springs Legal Def. Fund v. City of Austin, 874 S.W.2d 109,
110–11 (Tex. App.—Austin 1994, no writ). When both parties prevail on some issues but not
others, courts have apportioned the costs of appeal between the parties. See, e.g., City of Austin v.
Capitol Livestock Auction Co., 453 S.W.2d 461, 465 (Tex. 1970).
            Our distribution of the costs was based on which party prevailed on each portion of the
appeal and the magnitude of that portion of the appeal. Because this case involved multiple appeals
of different magnitudes, we assessed the costs accordingly. The most substantial appeal was brought
by UPRC against the Burkes. UPRC did not prevail on the principal issues and thus we assessed one
half the costs of the appeal against UPRC. While monetarily significant, the Burkes' appeal against
UPRC involved a less substantial substantive portion of the appeal. Since the Burkes did not prevail
on their appeal, we assessed one third of the costs against them. Although UPRC prevailed on the
portion of their appeal against PWW, this part of the appeal was intertwined with the appeal
concerning the Burkes. As the least substantial portion of the appeal, we ordered PWW to pay one
sixth of the costs of appeal. 
            The second contention of UPRC is that the Burkes lack standing due to their filing a
bankruptcy action. UPRC argues the trial court erred in failing to dismiss the Burkes' suit. Standing
is a component of subject matter jurisdiction; it cannot be waived and may be raised at any point. 
Anderson v. New Prop. Owners' Ass'n, 122 S.W.3d 378, 384 (Tex. App.—Texarkana 2003, pet.
denied). 
            Once a bankruptcy petition is filed, the estate takes ownership of all the debtor's property,
including his or her causes of action. 11 U.S.C.A. § 541(a) (West 1993); Douglas v. Delp, 987
S.W.2d 879, 883 (Tex. 1999); Texas-Ohio Gas, Inc. v. Mecom, 28 S.W.3d 129, 143 (Tex.
App.—Texarkana 2000, no pet.); Carter v. Carter, 21 S.W.3d 441, 443 (Tex. App.—San Antonio
2000, no pet.). However, "where an action is pending prior to the commencement of a bankruptcy
proceeding a trustee has three options: (1) to assume prosecution of the pending action; (2) to
consent to the debtor's continued prosecution of the action for the trustee's benefit; or (3) to decline
to prosecute the pending actions if it appears the prosecution would be fruitless." Carter, 21 S.W.3d
at 443.
            This suit was pending at the time the Burkes declared bankruptcy. On January 12, 2000, the
Burkes joined UPRC to the pending suit against PWW. On December 14, 2000, the Burkes filed
for bankruptcy. Thereafter, the bankruptcy trustee joined this suit with the Burkes. In taking this
action, it appears the bankruptcy trustee chose two of the possible options. He both assumed
prosecution and consented to the debtor's continued prosecution for the trustee's benefit. The
Fourteenth District Court of Appeals has suggested that, if a bankruptcy trustee has notice of a
pending suit and does not intervene, he is deemed to have consented to the prosecution. Sommers
v. Concepcion, 20 S.W.3d 27, 38–39 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (suit by
a trustee is barred due to res judicata when he had notice of the debtor's prior prosecution). As a
party, the trustee clearly had notice that the Burkes were continuing to prosecute the case. Therefore,
we find the trustee consented to the prosecution and the Burkes have standing. Any recovery will
inure to the trustee's benefit for the bankruptcy estate. We overrule UPRC's supplement to their
motion for rehearing.
            For the reasons stated, we overrule the motions for rehearing by PWW and UPRC. In
accordance with the suggestion of a remittitur, the Burkes have filed a remittitur of $653,700.00. 
We modify the judgment of the trial court and, as modified, we affirm the Burkes' recovery of
$842,300.00, plus prejudgment interest of $358,552.84 and postjudgment interest at the rate of ten
percent per annum.
 


                                                                        Jack Carter
                                                                        Justice
 
Date:               June 9, 2004